UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOANN CHAVES | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3-06-cv-1589 (JCH) |
| | : | |
| EXXON MOBIL CORPORATION | : | |
| d/b/a PLAINFIELD MOBIL-SOUTHBOUND, | : | |
| and MOBIL CORPORATION, | : | DECEMBER 31, 2008 |
| Defendants. | : | |

**BENCH TRIAL RULING**

**I.      INTRODUCTION**

The plaintiff, Joann Chaves, brings this action against defendants Exxon Mobil Corporation doing business as the Plainfield Mobil-Southbound and Mobil Corporation (collectively "defendants") for negligence arising out of a fall she took on the sidewalk outside the Mobil Service Station. The defendants deny any wrongdoing.

**II.     FINDINGS OF FACT**

A.      The Incident

Joann Chaves ("Chaves") and her daughter, Melissa Chaves, left their home in Marlboro Massachusetts at around 6:30 a.m. on December 14, 2004. They were driving to the Foxwoods Casino in Connecticut to meet two friends to play bingo.  Chaves had made this trip many times, about once every four to six weeks.  The drive took approximately one hour and twenty minutes.

En route to Foxwoods, at around 7:30 a.m., the Chaveses stopped at the defendants' service station ("the Station") on the southbound side of Interstate 395 in Plainville, Connecticut.  Chaves testified that she always stopped at this station to use

the restroom when she traveled to Foxwoods.  The Station runs parallel to Interstate 395.  Cars can pull off I-395 and can either pull along side the gas pumps directly in front of them or they can take a right before the pumps and park in the parking areas located adjacent to, and in back of, the Station.  The Station is east of the gas pumps. Directly in front of the Station there is a sidewalk, and in front of that is a fire lane where cars often park before entering the store.  In the front of the Station is a handicap ramp leading up to the entrance; it runs parallel to the curb and sidewalk.  There is also a set of stairs that lead directly to the entrance, running perpendicular to the sidewalk.

Upon entering the station plaza, Chaves pulled her car up to the sidewalk adjacent to the Station, in the same spot where she usually parked.  Melissa Chaves asked her mother to move the car forward slightly because there was a large puddle preventing her from exiting the car.  Chaves pulled the car forward slightly so that her daughter could exit without stepping in the puddle.  Melissa Chaves left the car first and began walking on the sidewalk into the Station.  Chaves exited her car and walked around the back of the car, and up onto the sidewalk.  Once on the sidewalk, Chaves took three to four steps in the direction of the stairs when her feet came out from under her, and she fell.  Chaves testified that she did not have time to brace herself before she fell.  Before she fell, Chaves did not observe any defect on the sidewalk.  She fell landing on the left side of her body with her left shoulder making contact with the ground.  When she fell, Chaves was in immediate pain, mostly in her left shoulder and arm.  She was wet from her left shoulder to knee.  She was wearing jeans, a sweatshirt, and sneakers.  Chaves remained on the ground "dazed' for about thirty to forty-five seconds.

2

Because she was walking in front of her mother, Melissa Chaves did not witness the fall, but turned around and saw her mother on the ground.  Melissa Chaves then helped her mother into a sitting position.  At this time, Chaves looked around the area in which she was sitting.  She described the area as "crystally," "slimy," and "wet" (hereinafter collectively referred to as "slimy/wet").[1]  This slimy/wet area where she fell was not large.  Chaves described it as "about the size of her rear end."  She did not see any salt or sand in the area.  Chaves does not know exactly what caused her to fall. When her daughter helped her to her feet, Chaves testified that she had trouble getting up because her bottom was sliding back and forth.  Melissa Chaves also testified that she had trouble helping her mom up because her feet were sliding back and forth.

After her daughter helped her up, they both walked into the Station.  Chaves was holding her left arm as she was in pain.  Once inside, she went directly to the restroom to check herself.  The restroom is located to the right of the cashier booth inside the station.  The cashier booth is enclosed in glass.

Chaves said that Melissa came into the restroom to check on her.  Chaves says she was in the bathroom for a couple of minutes.  When asked what her level of pain was, from 1 to 10 (with 1 being little pain) Chaves stated that when she was in the bathroom her level of pain was a 12.  She said the pain was worse than childbirth.

When they exited the bathroom, Chaves and her daughter stood off to the side of the cashier booth.  Chaves was hoping that someone would ask her about the fall

---

[1] Chaves indicates that the substance she fell on was slippery, and she believed it to be ice. However, in her deposition she stated that she did not know if it was ice.  Melissa Chaves also never described the substance as ice.  Instead, she said she slid back and forth on the substance when attempting to help her mother up after her fall.  The court finds the substance was pre- or post-ice.  In other words, it was not ice, but a substance that has some semi-solid nature to it, but is not hard like ice.

and to fill out an incident report.  She says she did not report her fall to anyone because she did not want to be rude.  Chaves and her daughter waited there a few minutes, but no one came up to her.  There were a couple of people waiting in line, but neither Chaves nor Melissa ever got in line.  Melissa Chaves said she made eye contact with one of the cashiers, but no one approached them.  She also testified that her mother got frustrated because no one approached them.  After waiting a few minutes, the two women exited the store the same way they had entered.

Though Chaves was still in great pain, she drove the rest of the way to Foxwoods because her daughter was an inexperienced driver.  Chaves and her daughter arrived at Foxwoods around 8 a.m. and met their two friends.  Chaves' clothes were still wet.  Chaves did not seek medical treatment at Foxwoods.  The foursome played Bingo from about 10 a.m. until 2 p.m.  Chaves says the pain in her arm got worse as time went on.

When they left at 2 p.m. Chaves was in such great pain that she allowed her daughter to drive home to Massachusetts.  She held her arm the entire ride home.  When she got home, she called her primary care physician at Southboro Medical Group. She then went to Southboro Medical Urgent Care where they took an x-ray and told her she fractured her arm and would need orthopedic surgery.

B.    Weather

On the morning of December 14, 2004, it was a cold and clear day.  There was no precipitation.  The weather report indicates that it was 32 degrees at 6 a.m., 33 degrees at 7 a.m, and 31 degrees at 8 a.m.  See Pl.'s Exh. 7.  During all of these times, the weather report indicates that "frozen precipitation," " standing water," and "snow

4

melt" were "unlikely."  Id.  According to Chaves, it did not rain or precipitate during her

drive from her home in Massachusetts to Foxwoods.  She testified that the sky was

clear.

       C.     Exxon Policy

Michelle Roberts, a sales associate at Exxon since 1996, was working at the

Station on December 14, 2004.  Two people were on duty that day from 7 a.m. until 9

a.m.  She has no recollection of an incident occurring that day.

According to Roberts, the policy for customer complaints is for the employee to

take down the name of the customer, the area where they fell, and any other pertinent

information.  At the time of the incident, the Station did not have pre-printed incident

report forms so the employee was required to take the information on a blank sheet of

paper.  Once the information was taken, the employee would forward the complaint

along to the Station manager.  Roberts testified she would go outside and assess the

situation after receiving a complaint regarding the conditions outside of the Station.

Often times, but not always, when incident reports are filed, the video tapes taken of the

inside and outside of the Station are preserved.  If no incident report is filed, the tapes

are recorded over.  Additionally, employees have access to a Polaroid camera to

document any incidents.  No incident reports nor Polaroid photos are on file from the

day at issue.

At the time of the incident, defendants had a policy for snow and ice removal.

See Def.'s Exh. 106.  The general policy consisted of a system in which the goal was

safety so no one, including both employees and patrons, got hurt.  For every task the

employees were charged to assess, analyze, and act safely ("AAA").  The policy

specifically addressed snow and ice removal.

Even though there was no snow, ice, or inclement weather at the time and day at issue, employees were always required to keep the inside and outside of the Station safe and free from debris.  As with snow removal, there were no set times to perform inspections of the premises.  Roberts stated that the frequency often depended on the conditions.

Employees were also required to take out the trash during their shift.  This required removing trash from the six trash cans throughout the Station and bringing it to the dumpster in the back.  The frequency of trash removal depended on how busy the Station was but could be up to two times per eight hour shift.  The process, according to Roberts, takes about fifteen to twenty minutes on average.

All of the supplies for trash and snow removal are kept in the back room of the Station.  The supplies included an ice pick, a bag of rock salt, a bucket for the salt, a shovel, and safety cones.

## III.   CONCLUSIONS OF LAW

### A.   Duty

It is undisputed that Chaves was a business invitee of the defendants and therefore, the defendants owed her the duty to maintain its premises in a reasonably safe condition.  Martin v. Stop & Shop Supermarket Co., Inc., 70 Conn. App. 250, 251, 796 A.2d 1277 (Conn. App. 2002).  To hold the defendant liable for her personal injuries, Chaves must prove (1) the existence of a defect, and (2) that the defendants knew or should have known, in the exercise of reasonable care, of the defect.  Cruz v.

6

Drezek, 175 Conn. 230, 238-9, 397 A.2d 1335 (1978).

      1.      <u>Existence of a Defect</u>

      Chaves argues that she slipped and fell on a slimy/wet area on the sidewalk belonging to the Station.  A condition is not a defect unless it renders the premises unreasonably dangerous.  <u>Martin v. Stop & Shop Supermarket Co.</u>, 2000 Conn. Super. LEXIS 2522, *2 (Conn. Super. 2000), <u>aff'd</u>, 70 Conn. App. 250, 251 (Conn. App. 2002).

      The court finds that Chaves did slip and fall on the sidewalk on December 14, 2004.  There is no evidence that Chaves caused her own fall.  She was wearing sneakers, walking at a reasonable pace, and did not seem to be distracted by anything at the time.  Both Chaves and her daughter, Melissa, described the area where she fell as slippery as evidenced by them both sliding around on the substance.  Further, the fact that Chaves' clothes were wet indicates there was a defect on the sidewalk.  While defendants argue that it was too wet to be ice, they do not contest that it could have been a combination of water and ice.  The court thus finds that there is enough evidence, though it is weak, that there was a defective condition on the Station sidewalk which caused Chaves to fall.

      2.      <u>Knowledge of the Defect</u>

      Finding that a defect existed that caused Chaves to slip, the question of liability comes down to whether the defendants knew of the defective condition.  In this case, Chaves concedes that there was no evidence of actual notice.  Thus, her case rests on whether the defendants had constructive notice of the defective condition.  "The controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the

7

defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." Considine v. City of Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (Conn. 2006). A reasonable length of time is a question of fact to be determined in light of the specific facts of the case. Id. "It is settled that circumstantial evidence can establish constructive notice." Kurti v. Becker, 54 Conn. App. 335, 339, 733 A.2d 916 (Conn. App. 1999). "The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." Kelly v. Stop & Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (Conn. 2007). Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." Id. at 777 (quoting Morris v. King Cole Stores, Inc., 132 Conn. 489, 494, 45 A.2d 710 (Conn. 1946)). However, the condition of the substance can evidence constructive notice. Morris, 132 Conn. at 493 (stating that a jury could reasonably find constructive notice upon hearing evidence that the lettuce the plaintiff slipped on was dirty and "looked as though several people stepped on it before.").

Chaves asserts that defendants had constructive notice of the slimy/wet mixture on the sidewalk because the temperatures were below freezing, and a reasonable inspection of the perimeter of the premises would have revealed the defect. Further, Chaves argues that an inference can be drawn that the defect had been there long enough for an employee to notice it because the substance that Chaves fell on was crystally and thus, indicates ice had formed over time.

Defendants assert that there is insufficient evidence to prove constructive notice.

8

They argue that there is no evidence of precipitation on or before the morning of the incident that would cause the sidewalk to be wet.  Moreover, they contend that there is no evidence that something spilled or leaked onto the area where she fell.  Defendants contend that there is no evidence to support an inference that it was there long enough to provide the defendants with constructive notice.

After reviewing the evidence, the court concludes that the defendants did not have constructive notice of the defective condition.  First, contrary to Chaves contention, the condition of the defect does not provide enough evidence to indicate how long the defect had been there.  The temperature over night was freezing but just barely.  By 7 a.m., the temperature had risen to 33 degrees.  Further, there was no evidence of precipitation that morning or the day before.  The only evidence of water was Melissa Chaves' statements that she had to ask her mother to pull up the car to avoid a puddle of water that had formed in the fire lane.  However, Roberts testified that water often formed in this area as there was a dip in the pavement.  This does not explain the substance on the sidewalk, however.

The law in Connecticut is clear: the mere presence of snow or ice is not enough to render the defendant liable.  Riccio v. Harbour Village Condominium Association, Inc., 281 Conn. 160, 164, 914 A.2d 529 (Conn. 2007)(finding that the presence of black ice without more, for instance, evidence that the ice was caused by the melting and freezing of snow rather than a spill or some other intervening factor, was not enough to prove liability).  Under Connecticut common law, the court looks to all the circumstances.  For example, in Kurti v. Becker, evidence that the warm air on the day before plaintiff's fall could have caused the snow that had accumulated near the

9

driveway to melt and then freeze again when the air temperature dropped below freezing "at least three hours before" plaintiff's fall was sufficient to prove constructive notice. 54 Conn. App. at 339. Similarly, in <u>Morris v. King Cole Stores, Inc.</u>, the court found the defendant liable for plaintiff's injuries from slipping on a piece of lettuce and strawberries on the ground near the produce stand. 132 Conn. 489. The <u>Morris</u> court determined that there was enough evidence to prove constructive evidence because of the appearance of the defective condition. <u>Id.</u> at 494. The substance was "dirty," "stuck to the floor," and "looked as though several people stepped on it before" <u>Id.</u> at 493. The court determined that, even though the evidence was weak, it was enough for a jury to find the defendant had constructive notice of the defect. <u>Id.</u> at 494.

The present case is unlike <u>Kurti</u> or <u>Morris</u> because there is no more than the presence of a slimy/wet substance to prove that the defect occurred for enough time to provide constructive notice to the defendants. While the court is aware that it takes time for ice to form, or to melt, there is no evidence in this record to indicate how much time it takes at 32 degrees[2] and whether it was enough time to provide the defendants with constructive notice. It is undisputed that no one knows exactly how long the substance was on the sidewalk. The temperatures were in fact freezing the morning of the fall and in the evening preceding it; however, the temperatures were never less than 30 degrees, and from about 4 a.m until 7 a.m. the temperature increased from 31 degrees to 33 degrees, which is above freezing. Pl.'s Exh. 7. Perhaps if the temperatures were well below freezing it would have been enough to provide

---

[2] It was 32 degrees at 5 a.m. and 6 a.m.

constructive notice to the defendants that ice could have potentially formed on the premises, but the defendants are not required to know when the temperatures are exactly freezing.  This is especially true when there has been no precipitation in the last 24 hours.

Chaves also argues that a reasonable inspection would have revealed the defect.  While the defendants' policy provides for inspection of the premise at all times, not just when there is inclement weather, the staff is not required to be out there at any specific times (e.g., every hour, every two hours, etc.).  Instead, they are required to keep the premises free from debris and safe for the patrons and employees alike.  There is no evidence that the defendants should have been aware of this defect and should have remedied it.  In other words, there was no precipitation that would have caused an inspection; nor was there evidence of any complaint from a customer that something had spilled on the sidewalk.

Even if Chaves presented enough evidence to prove that a reasonable inspection would have revealed the defect, there is still no evidence of how long the defect was there.  Unlike the condition of the lettuce in Morris, there is no evidence about this small, slimy/wet area which tends to suggest it had been there for any period of time.

Plaintiffs also failed to produce any evidence of where the liquid came from or what exactly caused the slimy/wet area on the sidewalk.  While it is true that water could have been there long enough to produce a pre-icy substance, there is no evidence of where the water came from.  It is possible that a customer could have spilled some of a cold drink with ice in the area shortly before Chaves fell.  On the

11

record before the court, it would be pure speculation for the court to try to conclude how or when that small area of slimy/wet liquid first appeared on the sidewalk.

Because there is no evidence of what caused the slimy/wet area on the sidewalk, and no evidence of how long it was there, the court finds that Chaves has failed to prove that the defendants had constructive notice of the defective condition. Therefore, the court finds that the defendants are not liable for Chaves' injuries.

## IV.    CONCLUSION

The court enters judgment in favor of defendants.  Accordingly, the court denies the defendants oral Motion for Judgment as a Matter of law (Doc. No. 100) as moot and orders the clerk to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 31st day of December, 2008.


 /s/ Janet C. Hall

Janet C. Hall
United States District Judge

12